UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

|  |  |  |
|---|---|---|
| WILL SINGLETON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:07-230-JMH |
| | ) | |
| v. | ) | |
| | ) | |
| SELECT SPECIALTY HOSPITAL- | ) | **MEMORANDUM OPINION** |
| LEXINGTON, INC. and SELECT | ) | **AND ORDER** |
| MEDICAL CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

** ** ** ** **

Pending before the Court are Defendants' Motions for Summary Judgment [Record Nos. 23, 27, 28, & 29]. The parties have submitted responses and replies in support of their positions. Accordingly, this matter is ripe for review. Plaintiffs claim that Defendants have violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"); and the Kentucky Civil Rights Act ("KCRA") by discriminating on the basis of race and by retaliating against them for protected activity. Plaintiffs also raise claims of defamation and tortious interference with business interest. For the reasons stated herein, Defendants' Motions for Summary Judgment will be granted in part and denied in part.

**I.  FACTUAL BACKGROUND**

Defendant Select Medical Corp. is a health care provider operating 93 specialty hospitals. Defendant Select Specialty

Hospital-Lexington, Inc. ("Select"), is a long-term, acute care hospital operating in Lexington, Kentucky, collocated with Good Samaritan Hospital. Select operates a four-bed intensive care unit ("ICU") in addition to its 42-bed acute care facilities. Select employs clinical staff that includes registered nurses ("RNs"), licensed practical nurses ("LPNs"), certified nurse assistants ("CNAs"), and respiratory therapists ("RTs"). Select also employs basic administrative staff.

Clinical employees work 12-hour shifts that change over at 7 A.M. and 7 P.M. each day. Clinical staff typically work three 12-hour shifts per week, but occasionally work more or less depending on patient needs. The Director of Clinical Services ("DCS") oversees the clinical staff. The DCS designates one seasoned RN per shift as a Charge Nurse to be an immediate supervisor for the clinical staff on the floor. Select's local administrative staff included its CEO, Human Resources Coordinator ("HRC"), and the DCS. Additionally, Select Medical Corp. staff involved in this litigation include the Corporate Regional Human Resources Director, the Division Director of Clinical and Quality Services, and the Division President.

The DCS position experienced significant turnover during the period relevant to this litigation. Between 2005 and March 31, 2006, Kim McGowen ("McGowen") served as DCS. Melissa Burress ("Burress") served as acting DCS from April 3, 2006, until May 26,

2006. From June 2006 to early October 2006, CEO Rick Daugherty ("Daugherty") or Division Director of Clinical and Quality Services Molly Persby ("Persby") filled in as DCS. Debra Prince ("Prince") was DCS from October 9, 2006, until January 8, 2007.

Select employs a Call Off policy in order to meet patient care demands during a particular shift. Select posts six-week work schedules two weeks in advance, but staff levels are adjusted based on the number of patients on the floor and their particular care needs. The A.M. Charge Nurse typically determines the staffing needs for the night shift. In deciding whether to call off clinical staff, the Charge Nurse must consider a number of factors, including the patient-to-staff ratio, patient acuity, whether staff members are able to work, and continuity of care. Select has established a hierarchy for determining the order in which nurses are to be called off. When deciding whether to call off a particular nurse, the Charge Nurse must also consider whether that nurse has worked 36 hours already, whether a nurse has called in unexpectedly for time off, and whether any nurses have asked to be at the top of the call off list. The reasons a nurse might call in to be removed from the schedule can be highly personal. For example, in this case, one nurse called off for a number of days to care for her seriously ill spouse. Select maintains records for each day that include the patient census, acuity of patients, number of "call-ins," and "call-offs."

In the interest of brevity, the Court will summarize the facts relevant to each plaintiff, remaining mindful that many events affected more than one plaintiff.

## A. Plaintiff Singleton

In August 2004, Select hired Plaintiff Will Singleton ("Singleton") as an RN. Singleton claims that Select terminated his employment on March 28, 2006, in retaliation for opposing Select's allegedly discriminatory practices in violation of Title VII, § 1981, and the KCRA. Singleton also raises state-law claims of tortious interference with his business interests and defamation that arose out of Select's decision to report Singleton to the Kentucky Board of Nursing ("KBN").

On August 16, 2005, Singleton wrote a letter to DCS McGowen complaining about wrongly being called off from work. McGowen told Singleton that he was correct and that it would not happen again. On October 1, 2005, the night shift Charge Nurse, Pam Clouse, wrote Singleton up for "loud" and "negative" behavior after he complained about not being assigned to the ICU for his shift. On October 5, 2005, Singleton reported to McGowen that Clouse was making racially derogatory jokes involving African-Americans and Hispanics. On November 5, 2005, Singleton again reported that Clouse was "continually talking about blacks." He also complained about scheduling and call offs. McGowen attempted to address Singleton's concerns by investigating his allegations, counseling Clouse, and

by assuming some scheduling duties.

On February 27, 2006, Singleton again wrote to complain about "harrassment and disrecard for Select policey [sic]". He specifically complained about white staff members being given preference over African-Americans and women in the call-in queue. Singleton cited specific dates to point out when African-American staff members were called off in favor of white staff members working. McGowen reported to Mary Burkett ("Burkett"), Corporate Director of Human Resources, that Singleton was a "disgruntled employee," complaining about call-offs, but did not mention his claims of discrimination. McGowen advised Burkett that Singleton might complain to corporate. In fact, Daugherty, Regional HR Manager Josceylon Buchs ("Buchs"), and Human Resources Coordinator Janet Whitlock discussed via email their belief that Singleton had tried to sue his former employer. Daugherty believed McGowen gave him this information.

On March 5, 2006, Singleton tried to dispense Dilaudid (hydromorphone) for a patient from a computerized dispenser located on the hospital floor. Staff members can access this machine and another store of narcotics to treat patients in pain as they need relief. Both sources are controlled in that the machine tracks access by name and the narcotics locker had a sign out log. On this particular day, the Dilaudid count was 36 pills at the beginning of Singleton's shift. Singleton was the only staff

member to access the Dilaudid during the relevant time period. The first time, he dispensed three Dilaudid pills, leaving a count of 33 in the system. The second time, Singleton conducted a pre-operator count of the pills but his user count of 30 differed from the system count of 33. In order to reconcile the discrepancy, Singleton asked for Clouse to observe his count.

At this point, the parties' versions of events differ. Singleton claims that the discrepancy was immediately attributed to a miscount, which Select's Director of Pharmacy ("DOP") later attributed to Clouse. Select claims that no such determination exists and that Singleton lacks evidence to support his version of events. Singleton points out that over 300 similar occurrences took place in the four-month period between August 2005 and December 2006. Select's DOP distinguished these incidents from Singleton's incident based on the involvement of narcotics. However, a review of the system log shows a number of other incidents where operator counts of narcotics differed from the system count in the machine. Also, the log is replete with examples of the carelessness with which pharmaceuticals were stored and tracked at Select. For example, on August 13, 2005, the count was off because a syringe of morphine was under the machine. On September 1, 2005, Charge Nurse Therisa Hughes "resolved" a discrepancy with hydromorphone by noting "I don't know what I did."

On multiple occasions, a number of nurses took out more drugs than were logged.

Following the discrepancy, Clouse reset the dispensing machine to reflect the current count of Dilaudid in the machine and reported the Dilaudid incident on a Confidential Incident Report. The DOP investigated the incident to determine whether Singleton "diverted" a controlled substance. Select defines "diversion" as the taking of medications that are intended for patient use by a clinician. Select policy requires that any diversion investigation include a review of the offending nurse's attendance records, performance file, narcotic dispensing records in comparison to other employees, and subjecting the nurse to a drug test. In Singleton's case, the investigation included looking back four to six weeks at his narcotic usage records, medical administration records, and patient treatment records for irregularities that might point to diversion. Select did not report any attendance or previous performance issues and did not note how Singleton's narcotic dispensing practices compared to other employees. Select never provided Singleton with the results of his drug test. The investigation revealed that Singleton's record-keeping practices did not meet Select's standards for patient care because Singleton failed to properly document the administration of medications in response to commensurate expressions of pain by patients. Singleton believes a number of write-ups relied upon by Select were

manufactured to support his termination because they were not kept with his personnel file and were not documented on Select's Disciplinary Action Form. Another employee, James Smith, testified that Select supervisors manufactured write-ups against him in late 2005 and early 2006 and withheld them from his personnel file. Select agreed the write-ups against Smith were unfounded.

On March 27, 2006, Daugherty, Burkett, Buchs, Persby, Whitlock, and McGowen discussed Singleton's situation. During this conversation, McGowen reported that Singleton was an excellent ICU RN and it was noted Singleton had solid performance reviews. Daugherty berated McGowen for rating Singleton so highly in view of his charting mistakes, after which she never returned to work. On March 28, 2006, Singleton met with Daugherty and Whitlock. Singleton recorded the conversation without their knowledge. Daugherty informed Singleton that he failed his drug test and terminated him for poor "control" practices. Select defines "control" as carelessness in the administration or documentation of administration of narcotics. Select reported Singleton's "control" issues to the Kentucky Board of Nursing ("KBN").

### B. Plaintiff Robinette

Plaintiff Pauline Robinette is a woman of Chilean descent. She was hired by Select as an LPN on November 13, 2006, on a probationary basis. In her application documents, Robinette identified herself as Caucasian. She later testified that she does

not look Hispanic.  As part of the pre-employment process, and as a condition of continued employment, Select required Robinette to pass a drug test.

On November 16, 2006, Robinette's Chilean mother visited her at the hospital.  A few co-workers expressed to Robinette their surprise that Robinette's mother was Chilean, that Robinette did not speak English with an accent, and that Robinette was fluent in Spanish.  Robinette testified later that these comments were not derogatory.  However, after this incident, Robinette claims Select treated her differently.  Other clinical staff members noted during this probationary period that Robinette was unable to perform fundamental nursing duties such as annotating records and administering medications.  On November 21, 2006, Robinette's coworkers reported seeing multiple prescription bottles in her purse.  The DCS at the time, Debra Prince, asked Robinette to take a second drug test following the discovery of the pill bottles in her purse.  Although Select clinical staff are permitted to take prescribed medicines, they are prohibited from working under the influence of medications at levels that might impact their ability to care for patients and they must inform Select of the prescription beforehand.

On November 27, 2006, Prince counseled Robinette about the reports of narcotic medicines and her poor job performance.  On November 30, 2006, Select received the results of Robinette's pre-

employment drug screening and the second test Prince ordered. Robinette failed both tests and was terminated. Her drug tests indicated levels of morphine twice those permitted by Select, as well as five times the permissible therapeutic limit of Lortab. During the hiring process, Robinette failed to disclose that she was recovering from back surgery, had lifting restrictions, and was on pain medication. As reasons for her termination, Select cited her inability to perform her job duties, omissions on her application, unsafe nursing practices related to taking narcotic pain medicines, and failed pre-employment drug-screening. Robinette now claims that Select illegally terminated her because of her national origin. Select reported Robinette to the KBN for failing the drug tests.

### C. Plaintiff Spencer

Plaintiff Tisha Spencer ("Spencer") is an African-American woman hired by Select as a CNA. On February 1, 2006, Spencer was overheard at work talking about religion and homosexuality with another employee, Angela Flynn ("Flynn"), who is a white woman. Select has a Cultural Diversity and Sensitivity policy that prohibits such workplace discussions. Select was notified of the conversation by two non-clinical staff members who overheard the conversation, Van Green ("Green") and Dwight Patten ("Patten"). Neither report stated who instigated the discussion or specifically made offensive remarks.

On February 3, 2006, Burress, the Charge Nurse, tried to explain to Flynn and Spencer the impropriety of their discussion. Flynn stated that she understood, but Spencer complained that she did not understand why the topic was improper. Spencer was suspended for two days pending an investigation into the incident, but was not scheduled to work either day. On February 6, 2006, Spencer was disciplined with a written warning, but Flynn received a verbal warning. Select justified the different punishments based on Spencer's unwillingness to accept that her conduct violated Select policy. The Disciplinary Action Forms for Flynn and Spencer reflect identical conduct, signed by McGowen and Daugherty. Spencer claims that Select disciplined her differently than Flynn because of her race. In meting out punishments, Buchs had no knowledge of either employee's race.

**D. Plaintiffs Hall, Jackson, and Logan**

The parties largely group together the claims and facts surrounding Plaintiffs Monica Hall ("Hall"), Tisha Jackson ("Jackson"), and Cabrina Logan ("Logan"). As such, this Court will do the same when convenient. All three women are African-American. Jackson is an RN; Hall and Logan are LPNs. Hall, Jackson, and Logan all assert claims that Select supervisors fostered a racially hostile work environment. Additionally, Hall and Jackson claim that Select terminated their employment in retaliation for complaints of discrimination at Select.

In support of their hostile work environment claim, the three assert the following facts. In October 2005, Singleton told the nurses that Charge Nurse Clouse made two racially derogatory jokes. Around the same time, Jackson heard Clouse make another joke about Hispanics using the term "wetback." On October 13, 2005, Logan heard Clouse make the comment that she should have called "1-800-wetback" in order to get an ice machine repaired. Around November 5, 2005, Charge Nurse Hughes made a comment about a family member "hunting coons," which Jackson overheard. In late 2005, Logan reported that Hughes directed her to do some task "or get back on the boat," a reference to a slave ship. Select reacted to the Singleton allegations by counseling Clouse. Hughes apologized to Logan for the boat comment. DCS McGowen reiterated her prior counseling of Clouse after the "wetback" comments. In February 2006, Select held Cultural Diversity and Sensitivity Training for all employees.

Hall and Jackson also claim that Select terminated their employment in retaliation for reporting discrimination at work. The claim stems primarily from an incident involving Hughes' attempts to enforce Select's dress code policy. On September 21, 2006, Hughes called in Jackson and Logan to work. Jackson and Logan arrived out of uniform. Select clinical staff members are required to wear green scrubs, except on Fridays. Jackson and Logan were called in to work on September 21st, a Thursday night

shift. Hughes told Jackson and Logan they were out of uniform. Jackson called Hall and asked her to bring her the proper uniform. Jackson and Logan became argumentative, accusing other employees of violating the policy and copying the dress code policy. Jackson told Hughes she was out of uniform for wearing multiple earrings in her ears and pointed out other employees violating the policy. Jackson accused Hughes of being racist for selectively enforcing the dress code against African-American employees.

At some point, Hughes tried to send Jackson home because she was being disruptive on the floor, but Jackson protested. Hughes reportedly said, "I can't take this, they won't quit." Although hospital security escorted Jackson and Logan from the floor, Jackson was paid as if she worked her entire shift and Logan was told she would be paid. After the dress code incident, Daugherty investigated the matter and heard Jackson's complaints that Hughes was discriminating against African-American staff members. On September 29, 2006, in an email from Daugherty to Buchs, Daugherty advised against firing Hughes as a "quick fix" and stated he had "no doubt" Jackson, Hall, and Logan were seeking legal advice about the incident. On October 2, 2006, Jackson was moved to day shift to avoid a conflict with Hughes. In an email, Buchs advised keeping a close eye on Jackson, Hughes, and everyone else involved. She also expressed that the floor needed a "fair and consistent" charge nurse to manage the staff. In another email, Daugherty

expressed the need for an "exit strategy for [all] these employees."

On October 5, 2006, Jackson, Logan, and Hall each filed charges with the Lexington-Fayette Urban County Human Rights Commission and the EEOC. Logan was no longer capable of working with Select after October 13, 2006, due to a workplace injury. On October 25, 2006, Jackson was asked to administer medication to a patient. She hesitated to do so because of her belief that the medicine might negatively interact with a previously administered medicine, but she eventually administered the drug. However, Select viewed her actions as insubordination and a failure to treat patients. Jackson was counseled and asked to perform a skills test after this incident in order to develop a performance improvement plan. On November 7, 2006, Jackson was terminated for insubordination and a poor attitude after she refused to participate in the skills assessment and was resistant to counseling by DCS Prince. Select reported Jackson's conduct to the KBN.

Hall was terminated on November 1, 2006, after failing to show up for work two consecutive days. Hall planned to go out of town after working the Wednesday night shift. Ordinarily, she worked Monday, Tuesday, and Wednesday. She based her decision to go out of town on the posted schedule and the fact that new schedules are posted two weeks in advance. When changes are made to the

schedule, nurses are given an updated schedule or notified by a
scheduler.  Hall told other nurses on the floor she would be out of
town for the weekend, but did not check her schedule before leaving
for the weekend despite seeing Hughes marking on it.  Upon
returning, Hall was terminated for missing work on October 28 and
29 without calling in.  Select tried unsuccessfully to reach Hall
over the weekend via cellphone.  Select treats such conduct as a
voluntary termination on the part of the employee.

### E. Procedural Background

Five of the Plaintiffs sued in one action, with Singleton
suing separately.  The parties agreed to consolidate these cases
for discovery and trial.  Singleton, Jackson, and Hall have
asserted retaliation claims under Title VII, § 1981, and the KCRA.
Jackson, Hall, and Logan have asserted hostile work environment
claims under Title VII, § 1981, and the KCRA.  Spencer and
Robinette have asserted racial discrimination claims under Title
VII, § 1981, and the KCRA.  Additionally, Singleton, Jackson, and
Robinette have asserted state law defamation and tortious
interference with a business interest claims.  For the reasons that
follow, summary judgment shall be granted in favor of defendants on
all of these claims except Jackson's claims of retaliatory
discharge in violation of Title VII, § 1981, and the KCRA.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325. The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994) (citations omitted). The Court must construe the evidence in the light most favorable to the nonmoving party, in this case, Plaintiffs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). A mere scintilla of evidence is insufficient; rather, "there must be evidence on which the jury could reasonably find for" the non-moving party. *Anderson*, 477 U.S. at 252.

## III.  ANALYSIS

Plaintiffs' § 1981 and KCRA claims can be analyzed under the framework established for Title VII claims. *See Newman v. Federal Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000); *Smith v.*

*Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000); *Brooks v. Lexington-Fayette Urban County Housing Authority*, 132 S.W.3d 790, 797 (Ky. 2004).

Plaintiffs claim that they have direct evidence of discrimination and can thus avoid the *McDonnell Douglas* burden-shifting approach applied to claims supported by circumstantial evidence. Direct evidence of discrimination "must establish not only that the plaintiff's employer was predisposed to discriminate . . . , but also that the employer acted on that predisposition." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

In this case, Plaintiffs claim that an email sent from Prince to Persby, in which Prince asked for input on the night shift situation, is direct evidence of retaliatory motive. However, a straightforward reading of the email suggests that Jackson and Hall could not be discharged because they claimed racism and discrimination. Thus, the email is not direct evidence because an inference is required to conclude that Select built a "huge paper trail" against these nurses in order to retaliate or discriminate against them. Plaintiffs also claim another email exchange, in which an "exit strategy" for Jackson, Hall, and Logan was discussed, is direct evidence. However, Plaintiffs have taken phrases out of context to support their position. The emails read in their entirety suggest concern about every employee involved in the dress code incident, including Charge Nurse Hughes. Similar

-17-

emails concerning Singleton were taken out of context and require an inference to decide that Select had a retaliatory motive and as such are not direct evidence. Plaintiffs are left with circumstantial evidence and the *McDonnell Douglas* framework for analyzing their claims.

## A.  Hostile Work Environment Claims

Plaintiffs Jackson, Hall, and Logan bring their claims for hostile work environment under Title VII, § 1981, and the KCRA. To make out a claim of hostile work environment, a plaintiff must show: "(1) she was a member of a protected class; (2) she was subjected to unwelcome[] harassment; (3) the harassment was based on sex or race; (4) the harassment created a hostile work environment; and (5) employer liability. *Ladd v. Grand Trunk Western Railroad, Inc.*, No. 07-2512, 2009 WL 77908,*4 (6th Cir. Jan. 14, 2009) (citing *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999)). This Court must consider the totality of the circumstances in determining whether a hostile work environment exists and "'should not carve the work environment into a series of discrete incidents and . . . measure the harm occurring in each episode.'" *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999) (quoting *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir. 1992)). "The fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work

environment." *Jackson*, 191 F.3d at 661. The use of racial epithets in a work environment can create an inference that racial animus motivated other conduct as well. *Id.* at 662. The Court must look to "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance.'" *Ladd*, 2009 WL 77908, at *5 (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)).

In this case, the Court need not analyze whether Select adequately responded to the actions at hand because those actions do not rise to the level of a hostile work environment. As an initial matter, almost all of the comments reportedly made by Clouse and, later, by Hughes are certainly racially derogatory in nature. Also, the fact that pejorative terms for Hispanics were made tends to show Defendants racial animus towards other minority groups. The fact that two charge nurses, Select's supervisors on the floor, made the comments cuts in favor of finding a hostile work environment. However, only a handful of comments were reported over roughly one year. None of the comments could be characterized as physically threatening or humiliating, except Hughes' comment to Logan that she "get back on the boat." The rest of the comments allegedly directed against African-Americans were heard secondhand, and at least one of those comments, Hughes' "hunting coons" comment, was admittedly a harmless reference to

hunting raccoons, and not a threatening racial slur. Moreover, most of the comments were addressed by Select. Clouse was counseled for her actions and Hughes apologized to Logan for her comments.

Importantly, reports of specific incidents ceased in late 2005. The fact that the Plaintiffs continued to work in the same positions for almost one year after the last reported comment suggests the discriminatory conduct did not unreasonably interfere with their performance as nurses. Plaintiffs half-heartedly suggest they garnered extra scrutiny because of their race but have offered little evidence that this scrutiny existed and that it impacted their ability to perform their jobs. In view of the totality of the circumstances, Plaintiffs have not provided enough evidence for a jury to reasonably conclude that Defendants' conduct was severe enough to support a claim of hostile work environment. Thus, summary judgment is granted with respect to these claims.

**B. Retaliation Claims**

Plaintiffs Singleton, Jackson, and Hall claim Defendants violated Title VII, § 1981, and the KCRA, by terminating them in retaliation for reporting racial discrimination. To maintain a claim for retaliation, a plaintiff must prove that: (1) she engaged in Title VII-protected activity; (2) Defendants knew she engaged in the protected activity; (3) Defendants subsequently took an adverse employment action against her; and (4) the adverse action was

causally related to the protected activity. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008). The burden of establishing a *prima facie* case is not onerous. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "Protected activity" includes opposing any employer practice that is unlawful under Title VII or participating in a Title VII investigation. *Johnson*, 215 F.3d at 578. Temporal proximity may constitute evidence of a causal connection when:

> an adverse employment action occurs very close in time after an employer learns of a protected activity . . . . But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

Mickey, 516 F.3d at 525.

Once the plaintiff establishes her *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir. 2008). The plaintiff then must demonstrate the proffered reason was not the true reason for the employment decision but was mere pretext. *Id.* (citations and quotation marks omitted). An employee proves pretext by showing either the proffered reason: "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd*, 2009 WL 77908, at *6 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078,

1084 (6th Cir. 1994)).

If an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretext by showing the employer was ultimately incorrect. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008) (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 414 (6th Cir. 2008) (quoting *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998)).

In this case, viewing the facts in the light most favorable to the nonmovant, Plaintiff Jackson has supported her claim of retaliation with evidence upon which a reasonable jury could find in her favor. However, Singleton and Hall have failed to support their claims with sufficient evidence of pretext. The Court notes that making out a *prima facie* case of retaliation is not an onerous burden.

### 1. Singleton

Singleton has failed to provide sufficient evidence of pretext to survive this Motion for Summary Judgment. Assuming, *arguendo*, that Singleton has made out a *prima facie* case of retaliation, Select has countered with a legitimate, nondiscriminatory reason

for Singleton's termination: his failure to properly correlate the administration of medication with patient pain assessments. Singleton has offered evidence to support the inference that Select's reason was pretext and did not actually motivate them to terminate his employment. First, Singleton claims Select manufactured the reason for his termination because HR and administrative staff believed Singleton had sued his previous employer. However, Select's communications on this point offer Singleton no support because the emails advise that any attempts to discipline Singleton must be fully documented. It would be incongruous to claim that Select risked retaliating against Singleton, knowing that he had attempted to sue a prior employer. Second, Singleton contends the medication dispensing machine logs suggest Select singled him out in order to build a case against him. The logs do support the claim that Select's drug "control" was seriously ineffective. However, Singleton has provided no evidence demonstrating that Select failed to discipline the other employees listed in the log, such that a reasonable jury might find in his favor. Finally, there is evidence and testimony, albeit arguably inadmissible, that supervisors at Select manufactured write-ups regarding another employee, James Smith, in late 2005 and early 2006, but this fact would only be relevant if Clouse were the supervisor about whom Smith complained. At best, Singleton is left with evidence of high performance ratings prior to his February 27

letter and the fact that the same supervisor he accused of discrimination reported his Dilaudid discrepancy. In other words, no jury could reasonably infer that Select's reason for terminating Singleton was pretext. He has failed to provide more than a "mere scintilla" of supporting evidence and his retaliation claim fails.

### 2. Jackson

Jackson has made out a *prima facie* case of retaliation. She engaged in protected activity by responding to Daugherty's inquiry into the dress code incident. *See Crawford v. Metro. Gov't of Nashville and Davidson County, TN*, No. 06-1595, 2009 WL 160424, at *5 (U.S. Jan. 26, 2009) (an employee's responses to employer's enquiries into Title VII violations are protected activity despite employee not initiating discussions). She also engaged in protected activity when she reported possible discrimination at Select to the LFUCG Human Rights Commission. Daugherty knew of Jackson's initial complaint because he spoke directly to her. Select later found out that she filed charges with the Commission and subsequently terminated Jackson. The fact that the termination came within one month of her Commission charges suggests that the termination was causally connected to her reports of discrimination. Furthermore, in internal emails sent between the dress code incident and Jackson's termination, Select administrators expressed concern that Jackson was making allegations of discrimination and the matter had to be "closely

monitored." Considering that the burden of establishing a *prima facie* case is not onerous and viewing the facts in her favor, Jackson has established a *prima facie* case of retaliation.

Select's legitimate, non-discriminatory reason for terminating Jackson was her insubordination and poor patient care stemming from her alleged refusal to push IV medications for a patient. Jackson's strongest evidence that this reason was pretext are the email discussions between Select administrators and human resources concerning how to get rid of her. Select argues that Jackson, along with Hall and Logan, created a disruptive environment on the night shift by constantly complaining about racism. However, Select consistently discounted Jackson's claims in response, particularly after the Dress Code incident. From the emails, a jury could infer that Select sided with Hughes' view of the situation in spite of Hughes's history of making racially derogatory comments. Moreover, an inference of pretext can be made from the lack of any meaningful investigation by Select. Allegations of discrimination by Singleton led to immediate and repeated investigations by McGowen. Select has not provided evidence that a comparable investigation occurred after Jackson's complaints. Instead, Select characterized the dress code incident investigation as an inquiry into the disruptive behavior of Jackson and Logan. Select administrators focused their attentions on eliminating the problem altogether, calling for write-ups anytime

those involved made mistakes.  A jury could reasonably infer that this was an open invitation to find a reason to terminate Jackson.

The same evidence supports the reasonable inference that Select did not make a reasonably informed decision before terminating Jackson's employment.  Select argues that they are not required to "leave no stone unturned" in their decision-making process, but Select failed to "unturn" the biggest stone, namely whether Hughes was applying the dress code in a discriminatory manner.  Instead, Select arguably re-characterized the incident as one involving an unruly employee.  Viewing the facts and drawing all reasonable inferences in Jackson's favor, Defendant's Motion for Summary Judgment as to Jackson's retaliation claim fails.

### 3.  Hall

Hall has failed to support her claim of retaliation with evidence.  Assuming, *arguendo*, that Hall has made out a *prima facie* case of retaliation, Select's legitimate, non-discriminatory reason for terminating her was the fact that she failed to show up for work or call in for two consecutive days.  Hall has not provided evidence that this reason was pretext.  In fact, Hall testified that she saw Hughes marking on the schedule before she left for the weekend, but did not state whether she directly informed a supervisor of her weekend plans.  Hall has no evidence that someone at Select intentionally altered the schedule in order to cause her to miss work.  Moreover, Select attempted to contact Hall when she

did not arrive for work.  Hall's primary argument is largely one of association, based on mentioning her name alongside facts related to Jackson's retaliation claim.  For example, when Jackson reported the dress code incident to Daugherty, his decision not to investigate any discrimination was arguably proof of pretext.  However, Hall was not involved in that incident, outside of Jackson asking her to bring the proper scrubs.  Hall has not provided sufficient evidence of pretext and thus Defendants motion for summary judgment on her retaliation claim will be granted.

## C. Discrimination Claims

Plaintiffs Robinette and Spencer bring their claims of discrimination under Title VII, § 1981, and the KCRA.  In the absence of direct evidence of discrimination, as is the case here, a plaintiff in a Title VII discrimination case may establish discriminatory employment practices by circumstantial evidence.  To state a prima facie case for racial discrimination, a plaintiff must show: "(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class." *Russell*, 537 F.3d at 604 (internal citations and quotations omitted).  A plaintiff may also satisfy the fourth prong by showing she was treated differently than similarly-situated non-protected employees.  *Id.*

Once a plaintiff meets her initial burden, the employer must

provide a "legitimate, nondiscriminatory reason" for its adverse employment decision. *Id.* If such a reason is provided, and to survive a motion for summary judgment, the employee must then prove "the [employer's] proffered reason was actually pretext to hide unlawful discrimination." *Id.* (internal quotations omitted). An employee can prove pretext by showing either "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action." *Id.* (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual by showing it was ultimately incorrect. *Id.* at 605. Whether there is an honest belief in a proffered reason is based on the employer's reasonable reliance on particularized facts before it at the time of the decision. *Id.* "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 414 (6th Cir. 2008) (quoting *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998)).

In this case, the discrimination claims of Robinette and Spencer fail because they have not proven pretext. Assuming, *arguendo*, that Robinette and Spencer have established their *prima*

*facie* cases of discrimination, Select has provided legitimate and non-discriminatory reasons for the adverse employment actions directed at each plaintiff. Robinette was terminated because she failed two drug tests and omitted from her job application the fact that she was on prescription painkillers and lifting restrictions. Spencer was suspended because she made comments about religion and homosexuality at work considered inappropriate and in violation of Select policy. In their responses to Defendants' pending motions against them, neither Robinette nor Spencer offer any evidence that these reasons were pretext. Thus, their claims of discrimination under Title VII, § 1981, and the KCRA fail as a matter of law.

## D. Defamation and Tortious Interference Claims

To the extent that any Plaintiffs' federal claims before this Court are dismissed, the Court declines to exercise supplemental jurisdiction over those Plaintiffs' respective state law claims.

Jackson's state law claims are all that remain. Jackson claims that Select defamed her when it reported her conduct to the Kentucky Board of Nursing. The Court disagrees. In Kentucky, the elements of defamation are: "(1) defamatory language; (2) about the plaintiff; (3) which is published; and (4) which causes injury to reputation." *McBrearty v. Ky. Community and Technical College*, 262 S.W.3d 205, 213 (Ky. App. 2008). KRS § 314.031(4) requires employers of nurses to report to the KBN any nurse "suspected of being unfit or incompetent to practice nursing by reason of

negligence or other causes . . . ." *Id.* An absolute privilege to defamation exists where a party is required by law to publish the allegedly defamatory language. *Burgess v. Paducah Area Transit Authority*, No. 03-cv-166, 2006 WL 2228956, at *9 (W.D. Ky. 2006) (unpublished) (citing Restatement (Second) of Torts § 592A (1977) in context of Open Records Act); *see also Salyer v. Patrick*, 874 F.2d 374, 377-78 (6th Cir. 1989) (family service workers are absolutely immune from defamation liability for filing juvenile abuse petition); *Bryant v. Bustle*, No. 2006-CA- 2595, 2008 WL 820942, *2 (Ky. App. 2008) (legal duty to report possible child molestation affords immunity from defamation suit).

In this case, Select was under a legal duty to report Jackson to the KBN. Jackson attempts to overcome this privilege by arguing that Select acted with malice. However, she points to no additional facts beyond her retaliation claim to suggest Select acted with malice. In fact, none of the testimony, emails, or other evidence supporting her retaliation claim suggested that Select reported her to the KBN because of her claims of discrimination at Select. Defendants' Motion for Summary Judgment as to Jackson's defamation claim will be granted.

**E. Tortious Interference with a Business Interest Claims**

Jackson has not provided sufficient evidence to support her claims of tortious interference. To recover for tortious interference in Kentucky, a plaintiff must prove "(1) the existence

of a valid business relationship or its expectancy; (2) a defendant's knowledge thereof; (3) an intentional act of interference; (4) an improper motive; (5) causation, and (6) special damages." *CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1080 (W.D. Ky. 1995). In this case, Jackson's claim for tortious interference fails. She has not provided any facts showing that Select knew of her involvement in a business relationship. Moreover, Jackson cannot prove special damages because she gained employment during the time that the KBN reviewed Select's complaint against her license. Jackson failed to offer sufficient facts upon which a jury could reasonably find in her favor and survive summary judgment. Thus, Defendants' Motion for Summary Judgment as to her tortious interference claims will be granted.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' claims of retaliation, discrimination, and hostile work environment under Title VII, § 1981, and the KCRA fail with exception of the retaliation claims of Plaintiff Jackson. Plaintiffs' defamation and tortious interference with a business interest claims also fail. Plaintiff Jackson's claims of retaliation remain pending.

Accordingly, **IT IS ORDERED:**

(1) that Defendants' Motion for Summary Judgment [Record No. 29] be, and the same hereby is, **GRANTED IN PART** and **DENIED IN PART**

to the extent that Plaintiff Jackson's retaliation claim remains pending, and

(2) that Defendants' Motions for Summary Judgment [Record Nos. 23, 27, & 28] be, and the same hereby are, **GRANTED.**

This the 27th day of January, 2009.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge